IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 21, 2003

## TOMMY JOE WALKER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 69441      Richard R. Baumgartner, Judge**

_____

**No. E2002-02431-CCA-R3-PC**
**July 29, 2003**
_____

Convicted in 1990 of first-degree felony murder, aggravated robbery, and conspiracy to commit aggravated robbery, the petitioner, Tommy Joe Walker, appeals the Knox County Criminal Court's dismissal of his petition for post-conviction relief, through which he claimed that ineffective assistance of trial counsel fouled his convictions. Because the record supports the denial of post-conviction relief, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOE G. RILEY, and THOMAS T. WOODALL, JJ., joined.

Joseph Liddell Kirk, Knoxville, Tennessee, for the Appellant, Tommy Joe Walker.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Although our supreme court on direct appeal reversed the petitioner's sentence of death on the felony murder conviction, the high court affirmed his convictions. *See State v. Walker*, 910 S.W.2d 381 (Tenn. 1995).[1] The petitioner was originally indicted along with his brother, E.J. Walker, and his nephew, Danny Branam, for the crimes against the victim, Gladys Houston. *Id.* at 383. The charges against the individual defendants were severed for trial. *Id.* The supreme court's opinion contains a helpful recitation of the facts of the petitioner's conviction offenses:

---

[1]Apparently, on remand, the trial court imposed a life sentence in lieu of the vacated death sentence.

The evidence heard by the jury, including [petitioner's] own admissions to various of the witnesses who testified, was sufficient to establish that he entered into a conspiracy, in combination with his brother and his nephew, to rob Gladys Houston, within the definition of the term conspiracy contained in T.C.A. § 39-1-601, et seq., repealed by Chapter 591 of the Public Acts of 1989. This statute provided in pertinent part that "the crime of conspiracy may be committed by any two (2) or more persons conspiring: (1) To commit any indictable offense.

. . .

[D]uring the early morning hours of 23 July 1987, Gladys Houston was shot to death when she arrived at her home on Potomac Drive in Knox County after working until about midnight at her family's livestock business in Sweetwater, Tennessee. Around 1:15 a.m. neighbors were awakened by the sound of gunshots and a honking horn. One neighbor looked out her window and saw a car driving away from the direction of the Houston house toward the Alcoa Highway. Summoned by a neighbor, sheriff's officers arrived at the scene to find Mrs. Houston inside her automobile, barely alive and slumped over the steering wheel. The driver's door, the glove box and car trunk were open. The evidence is conflicting as to whether the front passenger door was also open when the first officer arrived. The driver's side of the rear window of the vehicle had been shot through three (3) times, one bullet passing completely through the driver's headrest. Expended rounds were found inside the car in the front windshield on the driver's side, between the front seats, and in the passenger door. Spent 9MM cartridge casings were on the ground behind the vehicle. Officers discovered Mrs. Houston's purse outside the car on the passenger side. An unfired .25 caliber automatic weapon belonging to Mrs. Houston was lying on the floorboard on the driver's side. The keys to the automobile were missing. Mrs. Houston died later at a local hospital. She had bled to death from her wounds. She had been shot several times, once in the left hand, once through the right side of the chest, and once in the back of the neck, the bullet exiting through her nose. There was an additional, minor wound to her scalp. Around 8:30 a.m., later in the morning of the shooting, a neighbor taking a walk found a six-pack of beer, a paper bag containing tomatoes and an empty money bag scattered along the side of Potomac Drive leading from the Houston residence to the Alcoa Highway. Paper wrappers designed to hold stacks of quarters were strewn on the pavement near the money bag. Mrs. Houston's

husband identified the money bag as the one used by her to carry change from the vending machine at the stockyard. It had contained approximately $6.50 in quarters when she left work. A customer had also given her a sack of tomatoes the day before she was killed. A brown carrying case containing Mrs. Houston's jewelry, some cash and bank bags holding several hundred dollars in receipts from the restaurant and flea market at the stockyard were found in the car trunk when police conducted an inventory of the vehicle.

Other evidence established that about 6:45 p.m. on Wednesday, 22 July, three (3) unidentified men entered a bar called "Sam's Place" located near the Houston Stockyard in Sweetwater. The men left about 7:00 p.m. in a Cadillac and drove away in the direction of the stockyard. Around midnight that same evening a customer delivering cattle to the stockyard saw the same car sitting "in an unusual place" on the road at the stockyard. One person was in the car; another was standing outside on the passenger side. Neither of these men were identified. The same night between eleven and twelve o'clock two (2) stockyard employees were standing next to the Cadillac, which was parked at the stockyard. A man resembling Danny Branam, who both women knew, got out of the back of the car and, turning his face away from the two women, went inside the stockyard building. When he opened the car door the interior light came on and the two women saw two other people sitting on the front seat. The driver, a man resembling the [petitioner], had dark, curly hair and wore glasses. The person in the passenger seat had straight brown hair. After five or ten minutes the person resembling Branam returned to the car. Again he turned his face away from the witnesses. The car and its occupants drove away 20 to 30 minutes before Gladys Houston left the stockyard. The car seen by the several witnesses belonged to Ray "Speck" Elliott, the [petitioner's] brother-in-law. Police later found spent 9MM shells at Elliott's farm in Union County. These shells had been fired from the same gun as the bullets and shell casings found at the site of the Houston killing.

Elliott and his wife, Naomi, the [petitioner's] sister, testified that Ernest Walker, had asked to borrow Elliott's cadillac. At the time he was accompanied by [petitioner] and Danny Branam. The men said they wanted to borrow the car to "go try to make some money" in Sweetwater. They indicated that they were going to talk about "some business" with a man named Otis Bivens.

When the three men returned the car (a couple of days later according to Ray Elliott, early the following morning according to his wife), they had Elliott's 9MM gun. The [petitioner] informed Elliott that he had "borrowed" the gun and that Elliott would have to get rid of it because [the petitioner] had used it to kill a woman. [The petitioner] claimed he had been forced to kill the woman because she had a gun. Before leaving, he warned the Elliotts, "if this goes outside this room about what I have said about what happened, you will get the same thing the bitch got."

Three other persons testified [the petitioner] had confessed his participation in the homicide. The first of these was Terry Boling, a convicted felon and an acquaintance of both the [petitioner] and Ray Elliott. Boling testified that in the early morning hours of 23 July 1987 [the petitioner] came to his house and asked for cocaine and $20. [The petitioner] was high at the time and was driving Elliott's cadillac. When Boling stated that he had no cocaine and no money, [the petitioner] told Boling that he had just seen "this whore get her head blew off" and that "they had just got ... $6.50 in change and a bag of tomatoes." [The petitioner], who appeared unfazed by what had happened, explained he had gone "there" to make some money.

Jackie Lynn Dawson, Danny Branam's brother, testified that about 18 months after the Houston murder [the petitioner] had gotten drunk and told Dawson that he was involved in a murder in South Knoxville. [The petitioner] said he had gone to a house in the Martha Washington subdivision to rob a woman and that the robbery had been set up by Otis or Greg Bivens, who had told him that the woman would be carrying "a lot of money." According to Dawson's testimony [the petitioner] recounted how he had hidden behind a tree on the left side of the driveway, rushed out and yanked open the car door as the victim started to open it. When the victim pulled a gun from her pocketbook, he shot her. While he was checking around the car, the victim began to thrash about and [the petitioner] shot her several more times.

Peter Talarico, an inmate at the State Penitentiary in Pikeville testified that while he was helping [the petitioner] with legal research [the petitioner] told him that he, his brother and his nephew "went to rob this lady" and "he had to shoot her because she got on the horn." [The petitioner] said he got $6.00 in the robbery and that he [had] taken the keys from the car and opened the trunk to see if there was any money there.

*Id.* at 384, 386-88.

We now review issues raised in the petitioner's direct appeal to our supreme court that have some bearing upon the issues raised in the post-conviction proceeding now before this court. On direct appeal, the petitioner challenged the admissibility of the following out-of-court statements: Danny Branam's statement made to the petitioner's sister, Naomi Elliott; the petitioner's statements made to his sister and brother-in-law three or four days after the homicide; and the statements made by E.J. Walker to his sister, Naomi Elliott. *Id.* at 384. All of the statements challenged in the appeal were offered by the state through the testimony of Naomi Elliott. *Id.* at 385. The supreme court determined that all of the statements given by Branam and E.J. Walker to Naomi Elliott were inadmissible as hearsay because they were neither made during the course of the conspiracy to rob Ms. Houston nor to conceal the crimes of robbery and murder. *Id.* at 386. However, the high court held that the challenges to the admissibility of Branam's and E.J. Walker's statements had been waived due to the petitioner's failure to object to their introduction and to raise the issues in the motion for new trial, and moreover, the court held that the use of the statements was harmless error in light of the strong case against the petitioner, which included his own, multiple admissions to the crimes. *Id.* at 386-88.

The supreme court also considered, *inter alia*, an issue of prosecutorial misconduct in which the petitioner alleged

> that a transcript [of Branam's statement] was materially altered mid-trial to include []the damning phrase,[] ["]they were there,["] when the phrase had not appeared in three (3) previous transcripts, two of which had been prepared by the State [and] that the altered transcript was supplied mid-trial to defense counsel knowing defense counsel would only have a few minutes to review it.

*Id.* at 389-90.

The high court described the tape recording and the transcript authenticated by Naomi Elliott as follows:[2]

> The recording was deplorably poor in audibility. It was also peppered with profanity and vulgarities on the part of both Ms. Elliott and her nephew. The questioned statement was made by Mr. Branam. In the transcript produced by defense counsel it appears that he said, "I don't think--to tell you the truth, I don't think Jay and Joe would say nothing. (Inaudible)--They both know, (inaudible)--burn their

---

[2]The supreme court held that the transcript offered by the state was admissible because Naomi Elliott, a party to the recorded conversation, authenticated it as accurately reflecting the conversation. *Walker*, 910 S.W.2d at 395.

goddamn ass. I believe that somebody on down the (inaudible)--" In the final version submitted by the State this statement became, "I don't think--to tell you the truth, I don't think Jay and Joe would say nothing cause they were there and they both know, that's gonna--burn their goddamn ass. I believe its somebody on the outside or something."

*Id.* at 390. The court then ruled:

> We are in accord with the conclusion of the trial judge [in ruling on the motion for new trial] that there was significant evidence, not only in the tape recording of the conversation between Naomi Elliott and Danny Branam, but in the testimony of other witnesses, that would have allowed any rational trier of fact to find guilt beyond a reasonable doubt.

*Id.* at 391.

The court's majority opinion, authored by Special Justice O'Brien, was hardly unanimous on the issues surrounding the out-of-court statements. Then Chief Justice Anderson concurred in affirming the petitioner's convictions, although he concluded that the petitioner's "tactical" decision not to object to the introduction of the statements waived any appellate review of the statements' admissibility. *Id.* at 399 (Anderson, C.J., concurring). He wrote,

> In this case, the defendant failed to interpose an objection to the admission of the statements even though the trial judge specifically inquired if the defense objected before admitting the evidence now challenged as error. Thus, the trial judge had no opportunity to rule on the evidence that the defendant now claims was admitted in error.
> . . .
> Defense counsel was objecting to the State's use of one certain version of the transcript of the tape. Counsel never objected to admission of the tape itself, which was the evidence, as the trial court repeatedly instructed the jury.

*Id.* Chief Justice Anderson concluded that the plain error rule would not apply because, based upon trial counsel's statements during the hearing on the motion for new trial, counsel's failure to object to the introduction of the tape was the result of tactical choice. *Id.* at 400. Chief Justice Anderson noted that the trial judge had agreed that the decision to let the tape in was "well thought out." *Id.*

Justices Drowota and Birch joined in Chief Justice Anderson's concurring opinion. Justice Reid dissented from the majority's conclusion and opined that admission of the co-conspirators' statements was reversible error. *Id.* at 400-01 (Reid, J., concurring and dissenting).

On appeal in the present case, the petitioner claims that his trial counsel was ineffective in two respects: (1) his failure to object on hearsay grounds to the admission of Naomi Elliott's accounts of Danny Branam's and E.J. Walker's statements, and (2) his failure to discern and object to the inculpatory nature of the introduced transcript of Naomi Elliott's tape-recorded conversation with Danny Branam.

At the post-conviction evidentiary hearing, the petitioner's lead trial attorney testified that about two weeks before trial, he heard an audiotape of a conversation between Naomi Elliott and Danny Branam. The tape itself was mostly unintelligible, but the Tennessee Bureau of Investigation (TBI) made a transcript, as did a court reporter engaged by defense counsel. Counsel testified that no statements made by Branam on the tape placed the petitioner at the crime scene. Counsel testified that his copy of the taped conversation and his privately-prepared transcript differed from the state's tape and transcript. Defense counsel and the prosecutor discussed the variances but reached no agreement about an admissible version prior to the commencement of the trial.

In an in-chambers conference before trial, counsel objected to the use of Naomi Elliott's tape, and at the post-conviction hearing, he testified that the trial court had ruled it admissible on the basis of being a recording of a conversation that was in furtherance of a conspiracy. However, no objection to the tape was ever put on the record. Counsel testified that he had no one who could authenticate his own version of the tape because Naomi Elliott authenticated the state's version and the only other participant to the taped conversation, Danny Branam, had invoked the Fifth Amendment as a bar to answering questions about the tape.

On the morning of the fourth day of trial, the prosecutor presented defense counsel with a new version of a transcript that the prosecutor wanted to introduce into evidence. Counsel testified that neither he nor his co-counsel had an opportunity to review the transcript before the state called Naomi Elliott to testify, but defense counsel did not ask the court for more time to review the transcript. The state's new transcript contained statements that placed the petitioner at the scene of the crime. Counsel testified that he was not aware of these changes to the transcript until after it was presented to the jury through witness Naomi Elliott. Counsel testified that in the subsequent separate trial of E.J. Walker, the trial court deleted from the transcript a reference to the petitioner and others being present at the crime scene because the court ruled that that statement was not uttered on the audiotape.

Counsel testified that he was unaware that the statement "they were there" was included in the state's transcript until the prosecutor mentioned it five times during closing rebuttal argument. Counsel testified that no tactical reason could have supported allowing this statement into evidence and denied that he declined to pursue exclusion for tactical reasons.

The post-conviction court found that trial counsel did object to the introduction of the Branam tape "in chambers which was not on the record" and that "[i]t is unfortunate that the proceedings held in chambers [were] not later memorialized on the record." The post-conviction court found that defense counsel was unaware of the "they were there" statement in the new transcript until it was relied upon by the prosecutor during his final argument. The court further noted that the prosecutor "apparently had an epiphany and was miraculously able to hear an incriminating statement made by Mr. Branam that no one else before or since has been able to hear." Nevertheless, the court held that, although "it would have been preferable to have a contemporaneous objection to the introduction of the statement," the petitioner had not established that trial counsel had rendered ineffective assistance "during a contentious trial when the objection had already been overruled." The court stressed that counsel's performance must be viewed "in the atmosphere of a contentious and fluid trial setting," not "in the quiet and calmness of hindsight." Although the post-conviction court opined that the trial prosecutor should have provided adequate notice of the changes in the transcript and that he should not have saved his arguments about the new transcript revisions until his closing argument, *see* Tenn. R. Crim. P. 29.1(b), possible misconduct on the part of the prosecutor does not "equate to ineffective assistance of [defense] counsel."

We begin our assessment of the case by recalling familiar and settled rules of law. The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). On appeal, the appellate court accords to the trial court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

When a post-conviction court denies a petitioner's claim of ineffective assistance of counsel, this court, on appeal, must determine whether the evidence preponderates against a post-conviction court's findings (1) that counsel's performance was within the range of competence demanded of attorneys in criminal cases, *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and/or (2) that any deficient performance did not prejudice the petitioner, *Strickland v. Washington*, 466 U.S. 668, 687-79, 104 S. Ct. 2052, 2064-2069 (1984). *See also Powers v. State*, 942 S.W.2d 551, 557 (Tenn. Crim. App. 1996). Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley,* 960 S.W.2d at 580.

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather we view the performance in the context of the case as a whole. *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding of which the result is being challenged. *Id.* Therefore, this court should not second-guess tactical and strategic decisions by defense counsel. *Henley*, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. *Id.*; *see also Irick v. State,* 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998).

Even if the petitioner establishes that counsel's performance was not within the requisite range of competence, he must also demonstrate a reasonable probability that the result of the proceeding would have been different but for the defective performance of counsel. *Henley*, 960 S.W.2d at 580. A court must

> "consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . .."

*Henley*, 960 S.W.2d at 580 (quoting *Strickland*, 466 U.S. at 696-97, 104 S. Ct. at 2069).

Although the petitioner in his brief presents a forceful argument that he was prejudiced by trial counsel's deficient performance, we conclude that the record supports the lower court's denial of post-conviction relief.

We arrive at this conclusion, however, on different grounds than those primarily used by the lower court. In our view, trial counsel performed deficiently in both the activities cited by the petitioner in his brief. Relative to the failure to object to the extra-judicial statements as hearsay, the post-conviction court found, based upon trial counsel's testimony, that counsel did, in fact, object, albeit he did so in chambers and failed to memorialize the objection and ruling on the record. Thus, the lower court held that trial counsel *made* the objection and, accordingly, performed sufficiently. This view, however, fails to account for trial counsel's duty to take actions before and during trials that will afford his client the opportunity to adjudicate adverse trial court rulings on appeal. *See, e.g.,* Tenn. R. Crim. P. 12(b); Tenn. R. App. P. 3(e), 36(a). The failure to secure a record of his motion and of the court's denial of same precluded the appellate courts from reviewing the hearsay issue on the merits on direct appeal. We believe this lapse on counsel's part constituted deficient performance.

Similarly, the failure to request a recess before the state's continuation of the direct examination of Naomi Elliott so that defense counsel could have an opportunity to review the proffered transcript equates to deficient performance of counsel.

That said, we remain unpersuaded that the petitioner has demonstrated by clear and convincing evidence that he was prejudiced by counsel's rather narrow lapses. Although various state witnesses were arguably handicapped by credibility demerits, the state nevertheless presented evidence from at least four of these witnesses other than Naomi Elliott that the petitioner admitted that he killed Ms. Houston. Moreover, the thrust of the petitioner's defense was that Speck Elliott, whose physical appearance resembled that of the petitioner and who is Naomi Elliott's husband and the petitioner's brother-in-law, committed the crimes. In the context of the totality of the evidence, the triers of fact were necessarily aware that Noami Elliott's accounts of her conversations with

Danny Branam and E.J. Walker were assailable on the grounds that she was trying to exonerate her husband by assigning blame to the petitioner. In other words, the efficacy of Branam's and E.J. Walker's pretrial statements was hinged to the challenged credibility of Naomi Elliott. Furthermore, concerning the failure to object to the use of the transcript, we note that at trial the transcript was authenticated by the witness, Naomi Elliott. Ms. Elliott was apparently willing to authenticate the transcript, including the reference to the petitioner being at the scene of the crime, as being an accurate reflection of her conversation with Danny Branam. Accordingly, we conclude that, had defense counsel timely objected to the use of the transcript, the trial court in the petitioner's case might well have overruled the objection.

Thus, in the context of the entire evidence, we are unconvinced that the result of the trial would have been different had the hearsay statements been excluded. Accordingly, the denial of post-conviction relief is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE